1

2

3

4

5

6

7

8

9

10

11

12

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

13     CARRIE KRIDER,                   Case No.  1:14-cv-00245-SKO

14            Plaintiff,          **ORDER AFFIRMING ALJ'S DECISION**

15       v.

16     CAROLYN W. COLVIN,
    Acting Commissioner of Social Security,

17

         Defendant.

18

19     _____/

20                     **I.   INTRODUCTION**

21       Plaintiff Carrie Krider ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

23 for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").

24 42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were

25 submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

26 Judge.[1]

27

28

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge, and the matter was assigned for all purposes to Magistrate Judge Sheila K. Oberto.  (Docs 5, 6.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on May 19, 1958.  (Administrative Record ("AR") 196.)   On July 29, 2010, Plaintiff filed a claim for DIB, alleging she became disabled on July 24, 2008, due to a lower-back injury, a neck injury, and carpal tunnel syndrome in both hands.  (AR 211.)  Plaintiff's last date of insured status was September 30, 2009.  (AR 17.)  Therefore, the question for purposes of Plaintiff's DIB claim is whether Plaintiff was disabled or became disabled between July 24, 2008, and September 30, 2009 – the relevant period.

### A.   Relevant Medical Evidence[2]

On April 2, 2009, Plaintiff was examined by Marshall S. Lewis, M.D., for injuries she sustained to her back, neck, and upper extremities while working as a librarian for Pleasant Valley State Prison.  (AR 319.)  Upon examination, Plaintiff's chief complaint included pain in her neck that radiated down to her left arm and the tips of her fingers.  Plaintiff also complained of pain in her right hand and wrist that radiated up her forearm, but not down from her shoulder.  (AR 320.)  She also complained of "immense low back pain" that radiated down her left leg to her toes; she experienced numbness in her left leg from her buttocks down the back of her leg to her knee.  (AR 321.)  Plaintiff also described symptoms including depression, insomnia, nervousness, weight gain, loss of energy, forgetfulness, lack of concentration, confusion, frustration, and feelings of worthlessness.  (AR 322.)

Dr. Lewis reviewed Plaintiff's medical history beginning from 2000.  In 2000, Plaintiff began to experience pain in her right forearm, but she was able to return to work.  In 2003, after she returned to work she sustained an injury to her neck and back when a heavy cabinet started to fall over on Plaintiff, and she caught it and pushed it back with her left upper extremity.  (AR 328, 791.)  This caused pain in her neck, left hand, and back.  (AR 328.)  Plaintiff was initially examined by a chiropractor, and she was then referred to an orthopedic surgeon who obtained x-rays of her back and neck.  In March 2004, Plaintiff returned to regular duty work, but re-injured her neck and back while bending over to pick up some books.  (AR 329.)  She was then referred to

---

[2] Although all the medical evidence has been considered, only the evidence relevant to Plaintiff's arguments has been summarized in this order.

2

Daniel A. Capan, M.D., and was told that she had a tear in her right wrist and a second carpal tunnel surgery was recommended.  She was also diagnosed with herniated discs in her lower back and a lump in her neck.  (AR 329, 743-53.)  Plaintiff was taken off work, but the insurance carrier denied further treatment and only medication was prescribed.  (AR 329.)

Also according to Dr. Lewis' review of Plaintiff's medical records, Plaintiff filed for medical retirement in 2004, and it was approved in late 2007.  In May 2008, she was examined by Dr. Moelleke, who prescribed only pain medication and ointments.  The insurer denied further treatment, and Plaintiff was not seen by any other physicians until she presented to Dr. Lewis in April 2009.  (AR 330.)  Dr. Lewis noted he had reviewed a medical examination by James L. Strait, M.D., dated January 7, 2008, indicating that Plaintiff had been evaluated by Dr. Strait in February 2004, January 2005, and July 2006.  Dr. Strait indicated Plaintiff had not returned to work since January 2004 and underwent her last surgical procedures in February 2007 by Leonard Gordon, M.D.  Plaintiff was noted by Dr. Strait to have carpal tunnel syndrome, she was receiving no active treatment, but she complained of problems with her neck, low back, and bilateral upper extremities.  (AR 323.)  Dr. Strait's January 2008 examination showed a full range of motion in Plaintiff's cervical spine, full range of motion in both elbows, forearms, wrists and finger joints, and a full and painless range of motion in both shoulders.  (AR 323.)  Dr. Strait's report showed a normal sensory examination of both lower extremities, the straight leg raising test was negative bilaterally, and Plaintiff had a full range of motion in her hips with no pain complaints.  (AR 323.)  Dr. Strait felt that Plaintiff should undergo periodic physician follow-up visits with anti-inflammatory medication, analgesic medication, muscle relaxants, and antacids.  (AR 324.)

As to her daily activities, Plaintiff told Dr. Lewis she found it difficult to shower, dress, clean, and prepare food; to type, write, and use the phone; to walk, sit, lift, twist, squat, climb, and kneel for a prolonged period of time; and to use her hands for simple grasping, gripping, fingering, opening jars, and holding a cup.  (AR 331.)

Upon his April 2009 examination, Dr. Lewis rendered an impression of chronic cervical strain, residual neurapraxia,[3] and right carpal tunnel syndrome, status post-prior carpal tunnel releases with one ulnar tunnel release at the wrist; sciatica, left leg; atrophy of the left thigh; sensory loss; degenerative disc disease; chronic lumbosacral strain; and chronic neck pain; chronic low back pain; and mild left carpal tunnel syndrome clinically.  (AR 340-41.)   Dr. Lewis recommended a cervical magnetic resonance imaging scan ("MRI"), a lumbosacral MRI, and electromyography ("EMG") and nerve conduction tests of the bilateral and upper and lower extremities.  (AR 341.)

On May 12, 2009, Plaintiff underwent an MRI of her lumbar spine.  (AR 392.)   The radiologist reported that Plaintiff's vertebral bodies were normally aligned; there was no fracture, pathologic marrow infiltration, or subluxation; and "the cornus terminate[d] at the Mid L1 level and the cauda equina[4] and paraspinous tissues are intact."  (AR 392.)   The radiologist concluded that Plaintiff had a 3 mm diffuse disc bulge at L4-5, and a 2-3 mm central and paracentral[5] disc bulge at L5-S1.  (AR 392.)

On May 26, 2009, a Nerve Conduction & Electromyography Report of the Lower Extremities ("EMG/NCV") was performed to rule out any radiculopathy and/or neuropathy. (AR 393-410.)   The radiologist indicated the test showed "mild left L5-S1 root irritation." (AR 394.)  "No evidence of entrapment neuropathy or peripheral neuropathy" was noted, however. (AR 409.)   Also on May 26, 2009, Plaintiff underwent an EMG/NCV of her cervical spine and upper extremities to rule out or in chronic cervical strain, residual neuropraxia, and right carpal tunnel syndrome.  (AR 383-91.)

On July 2, 2009, Plaintiff had a follow-up examination with Dr. Strait, who again evaluated Plaintiff's upper and lower extremities.  (AR 791.)   Plaintiff complained of neck pain and did not believe that her cervical condition had changed since she was originally evaluated in

---

[3] Neurapraxia is the failure of conduction in a nerve in the absence of structural changes, due to blunt injury, compression, or ischemia.  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1281 (31st ed. 2007).

[4] The cauda equina is a collection of nerves at the base of the spinal column.  *Dorland's* at 313.

[5] Paracentral means "near a center."  *Dorland's* at 1395.

2004 after her work injury.  (AR 792.)  She described her lower back pain as constant and dull.  (AR 792.)  She noted pain radiating into both lower extremities, more on the left than the right.  She also complained of numbness and tingling in her lower left extremity brought on by prolonged sitting.  (AR 792.)  Plaintiff reported pain in her right hand, which was much worse than the left.  She experienced constant numbness and tingling in the right hand, primarily in the thumb and small fingers.   (AR 792.)   She complained of pain in her wrists with resulting weakness.  (AR 792.)  Dr. Strait commented that he had previously evaluated Plaintiff's neck and "felt that she had become permanent and stationary, with a disability precluding her from very heavy work."  (AR 794.)  Dr. Strait opined her condition had not changed, nor had his assessment concerning her disability.  (AR 794.)  Dr. Strait also noted that

> . . . the applicant remains permanent and stationary at the present time for her cervical spine.  I would consider her to be permanent and stationary for her lumbar spine at the present time . . . Her subjective complaints are substantiated by the objective findings . . . It would be my opinion that Ms. Krider is precluded from Heavy work due to her low back condition.

(AR 794.)  Dr. Strait also opined that Plaintiff should not return to her usual and customary occupation, and that she would qualify for occupational rehabilitation.  (AR 795.)

On December 7, 2009, Plaintiff was again examined by Dr. Lewis for follow-up care.  (AR 311-18.)  Plaintiff's cervical spine showed a range of motion "reasonably well preserved."  (AR 312.)   There was palpable tenderness throughout the paraspinous and upper trapezius musculature.  (AR 312.)  Examination of the lumbar spine showed limited range of motion secondary to pain complaints.  There was no "frank muscle spasm," and the sitting straight leg raising test was negative.  (AR 313.)  Dr. Lewis diagnosed lumbar spine disc bulges at L4-L5, L5-S1 pursuant to the MRI taken in May 2009, normal upper and lower nerve conduction studies, and mild L5-S1 irritation in the left lower leg.  (AR 313.)   The treatment plan included a new prescription for Vicodin and Soma as needed, and Plaintiff was to follow-up in four months for re-evaluation.

Plaintiff received follow-up care from Dr. Lewis between April 13, 2010, and September 13, 2010.  In April 2010, Plaintiff's physical examination was "virtually unchanged" from previous

1   examinations, and it was noted Plaintiff was in "mild acute distress." (AR 304.)  Plaintiff was able

2   to stand erect, but she had palpable tenderness throughout the thoracolumbar spine with frank

3   muscle tightness of the paraspinous musculature.  (AR 304.)  Plaintiff's forward flexion was

4   limited due to pain, and she was diagnosed with low back pain complaints and intermittent muscle

5   spasm.  (AR 304.)  Dr. Lewis noted that pain management consultation was requested, as he felt

6   Plaintiff was not receiving adequate medication at that time.  On July 20, 2010, Plaintiff again

7   followed-up with Dr. Lewis who noted that Plaintiff still reported pain in her back and her neck

8   which radiated to her upper extremities.  (AR 291.)  Although Plaintiff appeared not to be in any

9   acute distress, she did have "difficulty with range of motion of the cervical spine and she had

10   tenderness over the "levator scapula/trapezius junction."  (AR 292.)  Plaintiff was prescribed

11   Vicodin and Soma.  (AR 292.)  In September 2010, Dr. Lewis examined Plaintiff and noted that

12   the examination findings were "virtually unchanged" from her last examination.  (AR 284.)

13       On April 13, 2011, Plaintiff was seen by Kristof Siciarz, M.D., for examination of

14   Plaintiff's lower back and her carpal tunnel syndrome.  (AR 523-27.)  Plaintiff reported her back

15   pain was constant and dull, and described the pain as burning in the lower lumbar area.  (AR 523.)

16   Plaintiff also reported constant neck pain, which she described as a dull ache in the posterior

17   aspect of her neck without radiating pain.  (AR 523.)  She complained of numbness in her hands.

18   She underwent a carpal tunnel release in 2008 on her right hand, but she experienced no

19   improvement in her symptoms.  (AR 523.)  On examination, there were no spinal tenderness or

20   paraspinal spasms, but the straight leg raise test was positive at 60 degrees.  In her wrists and

21   hands, there was "no evidence of tenderness to palpation of the wrists" and her "range of motion

22   [was] grossly normal bilaterally."  (AR 526.)  Dr. Siciarz noted an impression of degenerative disc

23   disease of the lumbar and cervical spine with chronic back pain and mild decreased range of

24   motion of the back; bilateral carpal tunnel syndrome status post right carpal tunnel release without

25   significant improvement; and a new diagnosis of ulcerative colitis with abdominal pain.  (AR

26   526.)  Dr. Siciarz opined that Plaintiff could lift or carry up to 20 pounds occasionally, 10 pounds

27   frequently; stand or walk up to six hours cumulatively in an eight-hour day; and sit cumulatively

28   for six hours in an eight-hour day.  (AR 527.)  Dr. Siciarz noted Plaintiff was limited to only

occasional climbing, crawling, or kneeling, and she was unlimited in all aspects of manipulative function.  (AR 527.)

Craig Billinghurst, M.D., reviewed Plaintiff's medical records on May 2, 2011, and opined Plaintiff could occasionally lift/carry up to 20 pounds, and frequently lift/carry up to 10 pounds; stand or walk up to six hours in an eight-hour workday; and she could sit about six hours in an eight-hour workday.  Plaintiff was limited to only occasional climbing, kneeling, or crawling, but she was able to frequently stoop, balance, and crouch, and she had no manipulative limitations.  (AR 530.)

On July 14, 2011, Dr. Lewis completed a questionnaire regarding Plaintiff's conditions.  (AR 754-55.)  He opined that Plaintiff was precluded from performing any full-time work at any exertional level; he also opined Plaintiff was unable to sit for more than one hour in an eight-hour workday, and she could only stand or walk a total of two hours in an eight-hour workday.  (AR 754.)  He found Plaintiff limited in her ability to perform reaching, handling, and feeling with her hands such that she could not perform these activities for more than one hour.  (AR 755.)  He opined she had been limited to this degree since April 2, 2009.  (AR 755.)

On July 26, 2011, Plaintiff underwent a complete psychological evaluation by Roger A. Izzi, Ph.D.  (AR 541-46.)  Plaintiff described her chief problems as neck pain, back pain, colitis, carpal tunnel in both hands, and she indicated she felt depressed, angry, and tired.  (AR 541.)  Her average day included staying at home and resting; she noted she belonged to no social clubs or organizations, and she did not visit family or friends.  (AR 541.)

On examination, her posture and gait were unremarkable, and her mood was dysphoric; she drove herself to the appointment and arrived on time for the evaluation.  (AR 542.)

Dr. Izzi provided the following functional assessment:

> The results of limited psychological testing have been discussed in detail in a previous section.  The available medical records were reviewed.  The claimant presents with multiple medical problems.  Pain is a predominant feature.  Her mood disorder will fluctuate [as] her subjective perception of pain fluctuates.

Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene. The present evaluation suggests that the claimant does appear capable of performing simple and repetitive type task[s] on a consistent basis over an eight-hour period. Her ability to get along with peers or be supervised in work-like setting[s] would be moderately limited by her mood disorder. The deficits in short term memory, as suggested by the results of Wechsler Memory Scale IV, would limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period. On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues. On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

(AR 544.)

State agency physician W. Jackson, M.D., reviewed Plaintiff's medical records on September 12, 2011, and affirmed Dr. Billinghurst's May 2011 opinion regarding Plaintiff's physical functional limitations. (AR 547-49.)

On September 14, 2011, state agency physician A. Garcia, M.D., reviewed Plaintiff's records, which included Dr. Izzi's examination findings, and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment Form. (AR 666-79.) He opined Plaintiff has a depressive disorder, not otherwise specified. He concluded Plaintiff was only mildly impaired in her ability to maintain social functioning and maintain concentration, persistence, and pace; he found Plaintiff had no restrictions in her activities of daily living and no episodes of decompensation. (AR 674.) He opined that Plaintiff is able to maintain attention, concentration, and carry out one or two-step simple job instructions; relate and interact with co-workers, supervisors, and the general public; but she is unable to carry out an extensive variety of technical and/or complex instructions. (AR 679.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (106-22, 136-37.) On July 19, 2012, the ALJ held a hearing. (AR 35-62.) Plaintiff testified, assisted by counsel, and a vocational expert provided testimony. (AR 35-62.)

### 1. Plaintiff's Hearing Testimony

Plaintiff testified she has a high-school education, and participated in vocational rehabilitation in approximately 2005.  (AR 43.)  She receives Disability Retirement from the State of California.  (AR 42.)  She is able to drive twice a week, but between July 24, 2008, and September 30, 2009, the relevant period, she was driving only once a week.  (AR 42.)

She previously worked as a library technical assistant for the State of California in a prison library.  Because only 20 inmates were allowed in the library at a time, she had to open a 350-pound door "all day long."  (AR 47.)  The job also required her to unload large boxes of book and carry the boxes into the library. (AR 48.)  After leaving the job at the prison, she worked part time but was unable to perform that work due to problems with her hands, neck, and back.  (AR 44-45.)  She had two carpal tunnel surgeries on her right hand.  Her first surgery was in 2005 or 2006, and she had a second surgery in 2007 or 2008.  She underwent the second surgery because the first surgery "didn't work and there were more tears and they did what they call an overflap."  (AR 46.)  The second hand surgery was also unsuccessful in resolving her pain, which actually worsened after the surgery.  (AR 46.)  She also has problems with her left hand, but she has not had surgery on the left.  (AR 48.)  Because the surgery on her right hand was unsuccessful, she did not want to attempt surgery on the left although it was recommended.  (AR 48.)

Between 2008 and 2009, she could only use her hands for 15 to 20 minutes before needing a break for 30-minutes.  (AR 49.)  If she went back to using her hands after a break, she could only work with her hands for an additional 5 minutes and stated they "get weak the more I do." (AR 49.)  The pain in her hands is constant, and she experiences tingling and numbness.  (AR 49.)  These symptoms existed both before and after the hand surgeries.  (AR 49.)  She believes there is more the physicians can do with her right hand, but she is "afraid to continue to keep having surgeries."  (AR 50.)

She also has pain in her back, and about five years ago a worker's compensation physician recommended surgery.  (AR 50.)  Now she is treated by Dr. Lewis, who is also a worker's compensation physician.  She is afraid of back surgery because she has "talked to a lot of people and some people it helps and some people it doesn't and [she is] just afraid of it."  (AR 51.)

1        She experiences neck pain, which began at the same time as her back pain – when a work

2   cabinet fell on her in 2004.  (AR 52.)  Her neck pain is constant, and the doctors prescribe pain

3   medication but there is "not a whole lot they can do."  (AR 53.)  She sometimes needs to rest her

4   head to get the pressure off her neck, especially if she is working or looking at a computer screen.

5   She must rest her head by lying down every 30 minutes.  She experiences dizziness when she

6   turns her neck to the left.  (AR 54.)

7        Plaintiff's hips also cause her pain, and she can only walk for 20 to 30 minutes.  (AR 54.)

8   She believes the hip pain is related to her back problem.  The pain is alleviated when she lies on

9   her back with her knees bent.  (AR 54.)  She lies in that position about three to four times a day in

10   an eight-hour day.  (AR 55.)  She is up all night due to colitis, which started around 2009.  She

11   also suffers from depression that began with her back and arm injuries.  It causes her not to want

12   to go anywhere, and she is "not really interested in a whole lot of stuff."  (AR 55.)

13        She tried to work several different times after leaving her librarian technician position, but

14   "it just never worked out."  (AR 55.)  She is still receiving treatment through the Worker's

15   Compensation program.  (AR 56.)

16        **2.**     **Vocational Expert's Hearing Testimony**

17        A vocational expert ("VE") testified that Plaintiff's past work as a library technical

18   assistant is light, and as performed it required medium exertion.[6]   (AR 57.)  The ALJ posed

19   hypotheticals for the VE to consider.  The ALJ asked the VE to consider a hypothetical person of

20   the same age and education as Plaintiff and with the same work history who is limited to light

21   exertion with no repetitive heavy grasping or repetitive heavy lifting with her upper extremities.

22   (AR 58.)  The ALJ asked whether such an individual could perform Plaintiff's past work.  The VE

23   testified that such an individual could perform the work as defined by the Dictionary of

24   Occupational Titles ("DOT"), but could not perform the work as Plaintiff had performed her past

25   work.  (AR 58.)  The VE also testified that there would be other jobs available that such an

26

27   _____

28   [6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, [the Commissioner determines] that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c).

1  individual could perform such as cashier II, DOT 211.462-010; and a sales attendant, DOT

2  299.677-010.  (AR 58.)

3         In a second hypothetical, the ALJ asked the VE to consider a person with the same

4  limitations as previously described, but with the added limitation of only occasionally lifting and

5  carrying 20 pounds and frequently lifting and carrying 10 pounds; standing and/or walking for six

6  hours; sitting for six hours in an eight-hour workday with normal breaks; and only occasional

7  crawling, kneeling, and climbing.  (AR 58.)   The VE testified that such an individual could

8  perform Plaintiff's past relevant work as described by the DOT, as well as the two alternative jobs

9  described in the answer to the first hypothetical.  (AR 59.)

10        The ALJ posed a third hypothetical asking the VE to consider all the limitations of the first

11  hypothetical, but with the added limitation of work involving only simple, routine tasks.  (AR 59.)

12  The VE testified that this would eliminate Plaintiff's past relevant work, but such a person could

13  still work at the cashier II job or the sales attendant job described in response to the first

14  hypothetical.  (AR 59.)

15        The ALJ asked a fourth hypothetical assuming all the limitations of the second

16  hypothetical with the added limitation of simple, routine tasks.  (AR 59.)  The VE testified that

17  such a person could not perform Plaintiff's past relevant work, but could perform the other two

18  alternative jobs identified.  (AR 59.)

19        The ALJ posed a fifth hypothetical assuming a person of the same age and with the same

20  education and work history as Plaintiff who was limited to sitting for one hour; standing and

21  walking up to two hours in an eight-hour day; lifting and/or carrying five pounds; and who needs

22  to lie down or elevate her legs for an hour.  (AR 59.)  The VE testified there would be no work

23  such an individual could perform.  (AR 59.)

24        Plaintiff's counsel asked the VE to assume a person with the same limitations as in the

25  second hypothetical presented by the ALJ, but to also assume the person is limited to simple,

26  repetitive tasks; moderately limited (up to 20 percent limitation) in the ability to get along with

27  peers or be supervised in a work-like setting; and a limited ability to perform complex tasks on a

28  consistent basis.  (AR 60.)  The VE testified that a "20 percent problem with getting along with

peers and accepting supervision would probably eliminate all work." (AR 60.) Plaintiff's counsel also asked whether a limitation to lifting only 5 pounds and a reduction by 50 percent of the use of the person's hands would affect the individual's ability to work. The VE testified that if such a person were limited to five pounds of lifting in both hands, the individual would be able to perform only work considered "less" than sedentary.

### 3.    ALJ's Decision

On August 17, 2012, the ALJ issued a decision finding Plaintiff not disabled. (AR 17-26.) The ALJ determined Plaintiff has the Residual Functional Capacity ("RFC")[7] to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for six hours in an eight-hour day with normal breaks; but she must avoid repetitive heavy grasping or repetitive heavy lifting with her upper extremities. (AR 21.) The ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since July 24, 2008, the date of alleged onset through September 30, 2009, the date she was last insured; (2) has the following severe impairments or combination of impairments:  lumbar and cervical degenerative disc disease and bilateral carpal tunnel syndrome; (3) does not have an impairment or combination of impairments that meets or medically equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A or B; (4) was capable, during the relevant period, of performing her past relevant work as a library technician assistant; and (5) she can also perform alternative work that exists in significant numbers in the national economy. (AR 17-26.)

Plaintiff sought review of the ALJ's decision before the Appeals Council. (AR 12-13.) On November 5, 2013, the Appeals Council denied review. (AR 1-4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

---

[7] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1    **C.    Plaintiff's Contention on Appeal**

2           On February 24, 2014, Plaintiff filed a complaint before this Court seeking review of the

3    ALJ's decision.  Plaintiff contends that the ALJ erred by (1) improperly evaluating the medical

4    evidence in determining her RFC; and (2) relying on VE testimony that was not consistent with

5    the DOT.

6                                    **III.    SCOPE OF REVIEW**

7           The ALJ's decision denying benefits "will be disturbed only if that decision is not

8    supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

9    601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

10   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

11   Instead, the Court must determine whether the Commissioner applied the proper legal standards

12   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

13   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

14          "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

15   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

16   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

17   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

18   305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

19   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

20   may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

21   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

22                                   **IV.    APPLICABLE LAW**

23          An individual is considered disabled for purposes of disability benefits if he is unable to

24   engage in any substantial, gainful activity by reason of any medically determinable physical or

25   mental impairment that can be expected to result in death or that has lasted, or can be expected to

26   last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

27   1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

28   impairments must result from anatomical, physiological, or psychological abnormalities that are

1  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

2  such severity that the claimant is not only unable to do his previous work, but cannot, considering

3  his age, education, and work experience, engage in any other kind of substantial, gainful work that

4  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

5          The regulations provide that the ALJ must undertake a specific five-step sequential

6  analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

7  whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R.

8  §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

9  claimant has a severe impairment or a combination of impairments significantly limiting her from

10  performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c). If so, in the Third Step,

11  the ALJ must determine whether the claimant has a severe impairment or combination of

12  impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),

13  20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth

14  Step, the ALJ must determine whether the claimant has sufficient residual functional capacity

15  despite the impairment or various limitations to perform her past work.  20 C.F.R. §§ 404.1520(f),

16  416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

17  can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§

18  404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

19  sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

20  (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

21                              **V.    DISCUSSION**

22  **A.      The ALJ's Assessment of the Medical Evidence Regarding Plaintiff's Mental**
23  **          Condition**

24          Plaintiff asserts the ALJ failed to state specific and legitimate reasons for rejecting the

25  examining opinion of Dr. Izzi and instead assigning probative weight to the opinion of non-

26  examining physician, Dr. Garcia.  Plaintiff argues the ALJ rejected Dr. Izzi's opinion because he

27  was not Plaintiff's treating physician and because Dr. Izzi had only examined Plaintiff once.

28  Nevertheless, the ALJ gave weight to the opinion of Dr. Garcia who had never examined Plaintiff

on the ground that independent evidence supported Dr. Garcia's opinion.  Plaintiff contends the ALJ's reasons for rejecting Dr. Izzi's opinion and crediting the opinion of Dr. Garcia were neither specific nor legitimate.  Defendant argues the ALJ have specific reasons for rejecting Dr. Izzi's opinion and relying on Dr. Garcia instead.

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id*.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  *Id*.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Through the date of her last insured, September 30, 2009, the ALJ concluded that Plaintiff's diagnosed depression did not cause any more than minimal limitation in Plaintiff's ability to perform basic mental work, and therefore the condition was nonsevere.  (AR 19.)  The ALJ considered the July 2011 consultative examination performed by Dr. Izzi and the opinion of Dr. Garcia formulated after reviewing Dr. Izzi's examination report.  Dr. Izzi found Plaintiff limited to simple and repetitive tasks because the Wechsler Memory Scale IV test suggested short-term memory issues that would preclude her from performing complex tasks on a consistent basis.

1  (AR 544.)  Dr. Izzi also indicated Plaintiff's ability to get along with peers or be supervised in a

2  work-like setting was moderately impaired.  (AR 19, 544.)

3      Dr. Garcia reviewed Plaintiff's medical records and agreed with Dr. Izzi's opinion that

4  Plaintiff could maintain attention and pace to carry out tasks with one or two-step simple

5  instructions, but was unable to carry out an extensive variety of technical and/or complex tasks.

6  (AR 679.)  Dr. Garcia disagreed with Dr. Izzi as to Plaintiff's ability to interact with co-workers,

7  supervisors, and the general public, finding that Plaintiff had no limitation in those abilities.

8  (AR 679.)

9      The ALJ gave only limited weight to Dr. Izzi's opinion indicating that it was a one-time

10 examination, Dr. Izzi was not a treating physician who treated Plaintiff over a long period of time,

11 and thus Dr. Izzi would have been less able to accurately evaluate Plaintiff's long-term functional

12 capacity.  (AR 19.)  The ALJ gave "great weight" to the opinion of Dr. Garcia, who concluded that

13 while Plaintiff was limited from completing complex work tasks, she had no limitation in her

14 ability to interact with co-workers, supervisors, or the general public.  Despite giving Dr. Garcia's

15 opinion great weight, the ALJ's RFC contained no mental limitation whatsoever.

16     While Plaintiff argues Dr. Izzi's opinion should not have been rejected in favour of Dr.

17 Garcia's opinion, and Dr. Garcia's opinion, even if properly credited, was not properly included

18 into the RFC, the ALJ's consideration of Dr. Izzi's and Dr. Garcia's opinions is immaterial to the

19 disability period at issue.  The relevant period in this case is from July 24, 2008 (date of alleged

20 onset) through September 30, 2009 (date of last insured).  When a DIB claimant's period of

21 eligibility for disability benefits expires on a specific date, as was the case here, it is the claimant's

22 burden to prove that she was either permanently disabled or subject to a condition that became so

23 severe as to disabled her *on that date or prior to that date*.  *See Armstrong v. Comm'r of Soc. Sec.

24 Admin.*, 160 F.3d 587, 589 (9th Cir. 1998) (emphasis added).  While opinions rendered outside the

25 disability period are not *per se* irrelevant, *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988),  a

26 physician's ability to render a probative retrospective opinion will depend on factors such as the

27 physician's ability to review medical evidence from the relevant period, a claimant's own history

28 of the condition and symptomatology during the relevant period, and observations from others

1    regarding the claimant's symptoms and condition in the past, *see Bilby v. Schweiker*, 762 F.2d 716

2    (9th Cir. 1985).

3           Here, neither Dr. Izzi nor Dr. Garcia purported to provide a retrospective opinion about

4    Plaintiff's functioning prior to September 30, 2009.  And, even if their opinions could be construed

5    as offering a retrospective opinion, there was no evidence available in the record on which either

6    physician could base a retrospective opinion.  Plaintiff did not seek any mental health care during

7    the relevant period, and did not discuss the history of her symptomatology when she was

8    examined by Dr. Izzi.  (*See* Doc. 541.)  Moreover, neither physician was a treating doctor who had

9    information about Plaintiff's long-term functioning in the past – i.e., Plaintiff's functional abilities

10   prior to September 2009.  Dr. Izzi stated he reviewed Dr. Lewis' treatment notes of April 13, 2010,

11   as well as Plaintiff's adult function report forms.  Dr. Lewis' 2010 report, however, contains no

12   reports of psychological symptoms and it too is subsequent to the relevant period.  (AR 302-08.)

13   Plaintiff reported feelings of depression to Dr. Lewis in 2009 (AR 322), but her subjective

14   statements were unspecific and did not provide any evidence of how Plaintiff was functionally

15   limited.  Additionally, Plaintiff never sought additional medical treatment for these symptoms, and

16   Dr. Lewis did not prescribe anything or recommend care related to those symptoms.  Although Dr.

17   Izzi stated he reviewed an adult function report form completed by Plaintiff, the earliest adult

18   function report (Form SSA-3373) in the record is dated October 20, 2010, nearly a year past the

19   relevant period.  (AR 228-35.)  In that report, Plaintiff stated she was unable to handle stress well,

20   she felt "overwhelmed, depressed that [she is] unable to do most things."  (AR 234.)  The report

21   does not indicate when these symptoms began or how they specifically impacted her functional

22   abilities.

23          Dr. Garcia's review of the record occurred in September 2011.  (AR 666-69.)  As there was

24   no mental health treatment records besides the consultative examination performed by Dr. Izzi and

25   almost no subjective lay testimony about her symptomatology, Dr. Garcia's review of the record

26   was necessarily limited to Plaintiff's current functioning rather than her functioning during the

27   relevant period.  His written assessment makes no reference to Plaintiff's functional ability prior to

28   September 2011.  (AR 679.)  In sum, there was almost nothing for either physician to base a

retrospective opinion about Plaintiff's mental functioning during the relevant time period.   The circumstances here are distinguishable from other cases where retrospective opinions were found to be relevant to a disability period in the past.   For example, in *Bilby*, 762 F.2d at 716, the ALJ rejected diagnoses rendered after the relevant disability period because the opinions were retrospective.   On appeal, the court noted that the subsequent opinions were formulated on a review of treating records and supported by the opinion of a treating physician who had been treating the claimant since 1976, which was *prior* to the date of last insured.   Similarly, in *Stark*, a claimant proved that she had been disabled in 1950 on the basis of medical reports from 1957, 1960, and 1971 plus testimony from lay persons, two of whom had observed her from about 1940 on, and one who had observed her from 1955 to 1958.   *Stark v. Weinberger*, 497 F.2d 1092 (7th Cir. 1974).   In addition to the subsequent medical evidence and lay observations, there was also expert testimony from Stark's treating physician about the usual course of her disease and a consideration of when her condition first became present, which the appellate court found supported inferences about her condition in 1950 and before.

In contrast to these cases, Plaintiff has no treatment records for mental health prior to 2011, there is no treating or examining physician with longitudinal view of her mental condition, and nothing upon which a physician in 2011 could base a retrospective opinion – not even a subjective statement of the history of her symptomatology.   Other than a statement of symptoms to Dr. Lewis in 2009, there is nothing in the record for either physician to make inferences about Plaintiff's mental functional abilities prior to September 2009.   As a result, Dr. Izzi's and Dr. Garcia's opinions are not significant or probative of Plaintiff's mental functioning *during the relevant time period*.  *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).   The ALJ had no obligation to discuss this evidence.   Although the ALJ's analysis of these irrelevant opinions and the ALJ's decision to assign significant weight to Dr. Garcia's 2011 opinion is somewhat discordant, there was no err in omitting from Plaintiff's RFC the limitations provided by these doctors as neither provided an opinion about Plaintiff's mental functional abilities prior to September 2009.

1    Further, the ALJ had *no other* evidence to find Plaintiff was functionally limited due to a

2  mental condition during the relevant time period.  In an undated[8] adult disability report, Plaintiff

3  indicated her inability to work was due to her back, neck, and hand conditions – she did not

4  mention any mental impairment precluding her ability to work or limiting her abilities in any way.

5  (AR 211.)  In an October 20, 2010, adult disability report, Plaintiff indicated she felt overwhelmed

6  and "depressed" that she was "unable to do most things," but noted no specific functional

7  limitation arising from these feelings.  (AR 234.)  In a June 20, 2011, adult disability report

8  Plaintiff remarked that she used to be a "very social person," but because of the pain in her back,

9  neck, and hands and problems with colitis and acid reflux, she no longer wanted to "go anywhere."

10  (AR 251.)  While this evidence speaks generally to Plaintiff's internal mood and motivation, it

11  does not establish actual functional limitation related to her ability to perform work.  Moreover,

12  each of these disability reports was completed after the relevant time period and did not reflect on

13  her condition in the past.  Plaintiff was specifically asked at the hearing what conditions precluded

14  her from working during the relevant time frame, and she testified she was unable to work because

15  of her hand, back, and neck conditions, but noted nothing about any alleged mental limitations.

16  (AR 45.)  She testified later in the hearing that she began to have depressive symptoms about the

17  time of her back injury that included not wanting to go anywhere and not being interested in "a

18  whole lot of stuff."  (AR 55.)  Even this later testimony, however, does not provide any specific

19  evidence concerning how or to what degree Plaintiff was functionally limited from performing

20  work activities.

21    Thus, whether or not the ALJ properly weighed evidence that was *not material* to the

22  relevant time period, the error did not affect the ultimate disability determination.  The ALJ had no

23  obligation to consider this evidence as it was not probative or significant of Plaintiff's mental

24  health condition during the relevant time period.  In fact, had the ALJ included either physician's

25  opined mental limitations in Plaintiff's RFC, such inclusion would have been, as discussed above,

26  wholly without evidentiary support in the record.  In sum, the ALJ did not err by discussing the

27

28  [8] This report was completed at some point between July and November 2010 because it lists a doctor appointment completed on July 5, 2010, and a future appointment that had not yet occurred on November 11, 2010.  (Doc. 214.)

19

opinions of Dr. Izzi and Dr. Garcia or by failing to include any mental functioning limitations into the RFC.

**B.     The ALJ's Consideration of the Medical Evidence Relating to Plaintiff's Physical Impairments**

Plaintiff argues the ALJ improperly rejected Dr. Lewis' opinion provided in July 2011 in the form of responses to a questionnaire.  Dr. Lewis opined Plaintiff was limited to less than sedentary work because of her neck, hand, and back conditions in that she would only be able to sit one hour and stand or walk two hours in an eight-hour workday.  (AR 754-55.)  The ALJ rejected this opinion because the strict limitations opined by Dr. Lewis were not supported by the objective medical findings in the record.  (AR 24.)  Plaintiff asserts Dr. Lewis' July 2011 opinion should have been given greater weight than the other examining and non-examining physician opinions because Dr. Lewis is a treating physician with first-hand knowledge of Plaintiff's treatment and limitations.  Moreover, the ALJ failed to cite any specific objective medical findings that undercut Dr. Lewis' opinion.  Defendant argues the ALJ's rejection of Dr. Lewis' opinion as unsupported by objective evidence was proper, and there is substantial evidence in the record indicating the objective findings were mild in comparison to the limitations opined by Dr. Lewis.

Although the ALJ's discussion of Dr. Lewis' opinion did not re-incorporate the objective evidence the ALJ discussed at other places in the decision, an ALJ is not required to recite the magic words, "I reject the doctor's opinion because" to satisfy the burden of providing specific and legitimate reasons for rejecting a doctor's opinion.  *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  Rather, where the ALJ provides a detailed summary of the findings made by all the relevant experts, the court may draw specific inferences regarding the ALJ's reasoning where those inferences are there to make.  *Id.*

Here, Plaintiff was noted at several examinations to have a normal range of motion and normal strength in her extremities.  (*See e.g.*, AR 323, 337, 338, 793.)  Plaintiff was examined by Dr. Lewis in April 2009, and he reviewed Plaintiff's lumbar x-rays which showed well-aligned vertebra, a mild decrease in the L4-5 and L5-S1 disc space area, and an absence of spondylolisthesis.  (AR 339.)  Although Dr. Lewis ordered additional testing, he did not prescribe

lifting, sitting, or standing limitations due to Plaintiff's back condition, neck, or hand conditions at that time.   In May 2009, Plaintiff underwent EMG/NCV testing for both her upper and lower extremities with Dr. Katakia.  (AR 383-410.)  Dr. Katakia reported Plaintiff had mild tenderness near her cervical spine, but a normal range of motion.  (AR 385.)  He also reported that her lumbar spine exhibited "some" tenderness, but Plaintiff had a normal range of motion.  (AR 385.)   The EMG of Plaintiff's lower extremities showed mild left L5-S1 root irritation, and the NCV was within normal limits.   (AR 409.)   Dr. Katakia reported there was no evidence of entrapment neuropathy or peripheral neuropathy, and he noted Plaintiff had normal gait and balance. (AR 380, 409.)

Upon review of Dr. Katakia's EMG/NCV findings of Plaintiff's upper extremities, Dr. Lewis noted that the tests were "entirely normal," and Plaintiff needed no further physician follow-ups for her upper extremities.  (AR 303.)  Dr. Lewis did, however, indicate Plaintiff continued to require medication for her lower back pain.  (AR 303.)  In December 2009, Dr. Lewis noted that Plaintiff's lumbar spine showed only a small disc bulge without significant stenosis, pursuant to the May 2009 MRI results.  (AR 312.)  Physical examination showed Plaintiff had a limited range of motion in her lumbar spine secondary to pain, but her straight leg raising test was negative.  (AR 313.)

Dr. Lewis' July 2011 questionnaire answers did not discuss any objective evidence supporting the limitations opined; rather, the opined limitations appear unsupported by the objective findings he had considered during the course of her treatment in 2008 through 2009.  An ALJ may reject a treating physician's opinion that is unsupported by the clinical findings or the physician's own treatment notes.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  An ALJ may also properly reject a treating physician's opinion that is brief, conclusory, and unsupported by the record as a whole or by objective medical findings.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1995 (9th Cir. 2004).  While Dr. Lewis' opinion would be entitled to deference as a treating physician, the July 2011 questionnaire is unsupported by findings and reasoning, and the strict limitations opined do not appear to be consistent with the objective

1    medical evidence in the record as discussed by the ALJ.  As such, the ALJ's rejection of Dr. Lewis'

2    2011 opinion on this ground was supported by substantial evidence.

3    **C.      The ALJ's RFC Assessment Was Proper and the Hypothetical to the VE Was**

4    **          Complete**

5        Plaintiff contends the ALJ erred by failing to include all of Plaintiff's limitations into the

6    RFC.  Specifically, Plaintiff argues that although the ALJ credited the opinions of Dr. Garcia and

7    Dr. Billinghurst, the limitations to which these physicians opined were not included in the RFC or

8    in the hypotheticals posed to the VE.

9        In formulating the RFC, the ALJ must consider all of a claimant's limitations, even those

10   that are not severe, and evaluate "all of the relevant medical and other evidence," including the

11   claimant's testimony.   Social Security Ruling 96-8p, 1996 WL 374184.   Only limitations

12   supported by substantial evidence must be incorporated into the RFC.  *Lingenfelter*, 504 F.3d at

13   1041.   Likewise, a hypothetical question posed to a VE must set out all the limitations and

14   restrictions of the claimant.   *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).   The

15   hypothetical question must be accurate, detailed, and supported by the medical evidence.  *Gamer*

16   *v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279-80 (9th Cir. 1987).  However, the ALJ is

17   not required to include limitations in the hypothetical that are not supported by substantial

18   evidence.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).

19       Plaintiff notes Dr. Garcia limited Plaintiff to tasks with one or two-step instructions

20   (AR 679), and Dr. Billinghurst limited Plaintiff to occasional climbing, kneeling, or crawling, and

21   only frequent (as opposed to constant) balancing, stooping, or crouching (AR 530).  Yet, the RFC

22   assessed by the ALJ did not include any postural limitations for crawling, climbing, kneeling, etc.,

23   nor did it contain a mental limitation for tasks with only simple one-to two-step job instructions.

24       As it pertains to Dr. Garcia's opinion, as discussed above, the limitation was not relevant to

25   Plaintiff's functional limitations during the relevant disability period – July 24, 2008, to September

26   30, 2009.   Although the ALJ gave Dr. Garcia's opinion "great weight," that opinion was

27   immaterial and it was not error for the ALJ to omit Dr. Garcia's opined limitation from Plaintiff's

28   RFC.  Further, because the limitation for simple one- to two-step job instructions was properly

1    omitted from the RFC, the ALJ had no obligation to pose the limitations to the VE in a

2    hypothetical question.[9]

3         Regarding Dr. Billinghurst, the ALJ gave "significant weight" to his opinion, but the RFC

4    included none of the postural limitations opined by Dr. Billinghurst – i.e., only occasional

5    climbing, kneeling, or crawling.  (*See* AR 530.)   Even if it was error for the ALJ to omit these

6    limitations from the RFC, the error was harmless because the VE testified that, even with these

7    postural limitations, the Plaintiff could still perform her past relevant work.   Specifically, the ALJ

8    asked the VE the following hypothetical:

9
           Assume the same hypothetical individual with the limitations of occasionally lifting
10         and carrying 20 pounds and frequently 10 pounds; stand and/or walk for six hours
           and sit for six hours in an eight-hour day with normal breaks; occasional crawling,
11         kneeling and climbing.

12   (Doc. 58.)  The ALJ asked whether such an individual would "be able to perform the past jobs [the

13   VE] described."  (AR 58-59.)  The VE answered that "all of the jobs I described" were available.

14   The ALJ clarified, "So the past work, per the DOT, and the other jobs that you identified?"  The

15   VE responded, "Yes."  (AR 59.)

16        Plaintiff's past work, as characterized by the DOT, requires no climbing, balancing,

17   stooping, kneeling, crouching, or crawling.   DICOT 100.367-018, Library Technical Assistant.

18   Further, the additional work of Cashier II identified by the VE also does not require any climbing,

19   balancing, stooping, kneeling, crouching, or crawling.   DICOT 211.462-010, Cashier II.   Thus,

20   even if these limitations had been included in the RFC, the VE's testimony, along with the DOT

21   job descriptions of the jobs identified by the VE, establish Plaintiff retained the ability to perform

22   both her past relevant work and the alternative work identified.

23        The ALJ's failure to include in the RFC the mental limitation opined by Dr. Garcia was not

24   error.  The ALJ's omission from the RFC the postural limitations opined by Dr. Billinghurst was

25

26

27   _____
     [9] The ALJ did pose a hypothetical containing a limitation for simple, routine tasks (AR 59), and the VE testified
     Plaintiff could not perform her past work but she would retain the ability to perform alternative work including that of
28   cashier II and sales attendant (AR 58-59).  This alternative work, however, requires reasoning level 3.  *See* DICOT
     299.677-010 and DICOT 211.462-010.

also not harmful error because none of those limitations precluded Plaintiff from her past relevant work as described by the DOT or the alternative work of Cashier II identified by the VE.

## VI.   CONCLUSION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision was supported by substantial evidence and is, therefore AFFIRMED.   The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security and against Plaintiff.

IT IS SO ORDERED.

Dated:   **July 16, 2015**                          **/s/ Sheila K. Oberto**
                                                          UNITED STATES MAGISTRATE JUDGE